## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KIMBERLY LYNN MORAN,

    *Plaintiff*,

*v.*                    CASE NO. 2:13-cv-13452

CAROLYN W. COLVIN        DISTRICT JUDGE DENISE PAGE HOOD
Commissioner of Social Security,    MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, that Defendant's Motion for Summary Judgment be **DENIED**, and that the case be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g).

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Commissioner's decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 10, 13.)

Kimberly Moran ("Plaintiff") was thirty-seven years old at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 56.) Plaintiff worked at Nationwide Income Tax in 1994, (Tr. at 59, 179), and as a meat wrapper and stock clerk at Meijer from 1997 until 2004, when she suffered the back injury leading to this disability claim, (Tr. at 60-62, 183, 223). She testified that she returned to Meijer for roughly eight months in 2007 as a gas station monitor.[2] (Tr. at 60-64, 232.) On February 1, 2011, Plaintiff filed the present claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Tr. at 169.) She alleged that she became unable to work on August 8, 2007. (Tr. at 169.)

The claim was denied at the initial administrative stage. (Tr. at 131.) In denying Plaintiff's claims, the Commissioner considered discogenic and degenerative back disorders. (*Id.*) On November 28, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Patricia S. McKay, who considered the application for benefits de novo. (Tr. at 41-122.) In a decision dated March 17, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 19, 34.) Plaintiff requested a review of this decision on April 11, 2012. (Tr. at 15.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on June 18, 2013, when the Appeals Council

---

[2] Though she testified that she went back to work in 2007, (Tr. at 62), she told her physician in October 2006 that she returned to work that month. (Tr. at 302.) Her wage report reflects only $191.47 in earnings for 2006. (Tr. at 179.) At the hearing, Plaintiff could not remember if she worked in 2006, if the money came from workers' compensation, or if it was from her labor union. (Tr. at 64-65.)

denied Plaintiff's request for review. (Tr. at 1-3.) On August 13, 2013 Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

**B.      Standard of Review**

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012)

(quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th

Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.   Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. § 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

5

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC

[residual functional capacity] and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2010 and had not engaged in substantial gainful activity since August 8, 2007, the alleged onset date. (Tr. at 21.) At step two, the ALJ concluded that Plaintiff had the following severe impairment: "lumbar spine pseudoarthrosis status post L4 to S1 revision laminectomy and posterior spinal fusion with bone graft and instrumentation at L4, L5, and S1." (*Id.*) At step three, the ALJ found that Plaintiff's impairment did not meet or equal one of the listings in the regulations. (Tr. at 23-25.) At step four, the ALJ found that Plaintiff was able to perform past relevant work as a surveillance systems monitor, the generic title of her gas station monitor position. (Tr. at 32-35.) The ALJ also found that Plaintiff was thirty-six years old on the last date of her insurance, which put her in the "younger age" category. (Tr. at 32.) *See* 20 C.F.R. §§ 404.1563, 416.963. (*Id.*) At step five, the ALJ found that Plaintiff could perform a reduced range of light work in jobs existing in significant numbers in the regional economy. (Tr. 25-31.)

### E.    Administrative Record

The earliest report in the Record is a single sheet from March 3, 2005 listing dates from outpatient rehabilitation appointments from the previous five months. (Tr. at 267.) The next report, from Dr. Lawrence T. Kurz, provides substantially more information. (Tr. at 314-16.) Dr. Friedman, an orthopedic surgeon, wrote to Meijer of the results from a consultation with Plaintiff on April 5, 2005 regarding back pain. (Tr. at 314.) Plaintiff complained that her lower back hurt

after an injury at work on August 1, 2004. (*Id.*) The "dull ache" spread to both legs, especially her left, and was interrupted by intermittent tingling and numbness. (*Id.*) She rated the pain anywhere from four to eight out of ten on a visual analog ("VA") scale and came to Dr. Kurz, she claimed, after physical therapy, acupuncture, epidural steroid injections, and Vicodin had failed. (*Id.*)

Dr. Kurz found mostly normal results: her motor strength and reflexes were normal and there were no abnormalities or atrophy in her extremities. (Tr. at 314-15.) Her spine likewise seemed normal "except for some diffuse low back [and sacroiliac region] tenderness . . . ." (Tr. at 314.) She also had normal gait, coordination, and mood. (Tr. at 315.) X-rays of her back and pelvis taken during the appointment showed "some sacroiliac joint narrowing as well as narrowing at the L4-5 and L5-S1 disc spaces." (*Id.*) Dr. Kurz reviewed an MRI from the previous month, noting "decreased signal in the L4-5 and L5-S1 disc spaces, as well as a small central disc protrusion L5-S1 greater than L4-5." (*Id.*) He diagnosed bilateral lumbar radiculopathy, lumbar disc protrusion, internal lumbar disc disruption, and possible sacroilitis. (*Id.*) The recommended treatment plan included two medications, Medrol Dosepak and Neurontin; cortisone injections from Dr. Joel R. Schechet; and consultations Dr. Jeffrey Last, a pain psychologist. (Tr. at 315-316.) They would consider spinal fusion in the future if necessary. (Tr. at 316.)

Plaintiff followed up on the referral to Dr. Schecht on April 29. (Tr. at 311-13.) She described the pain as "burning, sharp, aching, throbbing, and shooting," and rating it anywhere from level six through nine on the VA scale. (Tr. at 311.) She tried Bextra, Celebrex, Flexeril, Skelaxin, Zanaflex, and Voltaren in the past, and now took Vicodin and extra strength Motrin. (*Id.*) Prior diagnostic tests showed "sacroiliac joint changes bilaterally" and "spondylosis at L5-S1 and L4-5." (Tr. at 311-12.) Other tests uncovered no abnormalities aside from lower back tenderness.

8

(Tr. at 312.) She walked "well on [her] heels and toes" and she generally appeared "[h]ealthy." (*Id.*) Dr. Schechet's diagnoses mirrored Dr. Kurz's, except he assessed definite sacroilitis. (*Id.*) He provided a sacroiliac steroid injection, prescribed Neurontin, and requested Plaintiff return in a few weeks. (*Id.*)

She next saw Dr. Schechet on June 10, 2005 to receive more injections, again at Dr. Kurz's direction. (Tr. at 309.) Plaintiff did not find them helpful the first time, however, and Dr. Schechet ceased this treatment method. (*Id.*) Neurontin, like her other medication, proved futile as well; only Vicodin gave her relief and she requested a prescription. (*Id.*) Dr. Schechet declined, informing her that his approach avoided opiates. (Tr. at 309-10.) Instead, he discussed discogram studies, but Plaintiff seemed hesitant after she learned that it involved injecting dye into the discs without anesthesia. (Tr. at 310.) Dr. Schechet added "[p]ossible lumbar facet inflammation" to the diagnoses and they accordingly decided to seek workers' compensation approval for lumbar facet joint injections. (*Id.*) The examination again revealed lower back tenderness and she also had pain in both legs during Gaenslen's maneuvers. (Tr. at 309.) The next session, on July 8, mirrored the prior one; Plaintiff still ached and was reluctant to undergo the discogram procedure. (Tr. at 308.) Dr. Schechet administered lumbar facet injections and was disappointed at the unusual lack of immediate pain relief. (*Id.*)

On November 1, 2005, Dr. Kurz reported that Plaintiff was "getting progressively worse." (Tr. at 307.) The Medrol Dosepak and Neurontin failed to help, but Lortab occasionally gave relief. (*Id.*) Dr. Kurz stated that her lumbar motions were "quite limited," and the "[l]umbar discogram was positive at L4-5 and L5-S1." (*Id.*) However, she walked normally, had normal neurologic results in her legs, normal reflexes, negative straight leg raises, normal range of motion in her hips,

and no other abnormalities. (*Id.*) Plaintiff decided she needed surgery–Dr. Kurz planned a bilateral posterior instrumentation and fusion at L4-5 and L5-S1, a decompressive laminectomy, and "maybe discectomy at both levels." (*Id.*) He also admonished Plaintiff to quit smoking. (*Id.*) An MRI a few days later revealed "[s]mall" protrusions without stenosis at L4-5 and L5-S1. (Tr. at 276.)

Dr. Kurz operated on Plaintiff in mid-January, 2006. (Tr. at 306.) He visited her one week later, learning that her lower back pain persisted, but otherwise she was "doing reasonably well": her gait, reflexes, and range of hip motion were normal (*Id.*) He prescribed Oxycodone for the post-surgery pain. (*Id.*) One month later, on February 23, he concluded she was "doing quite well," only taking Oxycodone when necessary. (Tr. at 305.) She reported no numbness, tingling, or radicular complaints, her examination results remained normal, and x-rays showed proper fusion at L4-S1 "with the instrumentation in place." (*Id.*) Her steady progress continued into May, and Dr. Kurz again noted "improving" back pain and normal test results. (Tr. at 304.) He felt she could now handle physical therapy. (*Id.*)

Plaintiff began therapy with Alvin Miller on May 5, 2010. (Tr. at 291.) She related her work injury and described the pain–at a four to seven on the VA scale–in her "left lower extremity, specifically [the] gluteal region, lateral calf, occasionally in her foot . . . ." (*Id.*) Her knee "gave out" repeatedly, she claimed. (*Id.*) Mr. Miller classified her gait as guarded and noted her "forward flexed posture, posterior pelvic tilt, protracted shoulders and forward head." (*Id.*) Her strength and reflexes were normal. (*Id.*) He also wrote that she was "unable to carry out daily functional activities . . . pain free, without restriction." (*Id.*) The six-week treatment program he laid out included an array of methods: massage, electrical stimulation, stretching, balance, coordination,

and agility. (Tr. at 292.) If followed, he opined that Plaintiff would have a "[g]ood" potential for rehabilitation. (*Id.*)

The Record contains only three other reports from Mr. Miller in 2006. (Tr. at 284-90.) On June 13 she claimed to have achieved no progress in decreasing the pain, typically rating it at seven on the VA scale. (Tr. at 289.) Standing longer than five minutes, "especially during cooking," proved impossible and she moved with guarded gait. (*Id.*) Her gluteal muscles hurt only on palpation; but her leg pain seemed inexorable, intensifying but never abating. (*Id.*) Mr. Miller concluded, "[t]he patient had full range of motion, as well as strength, and [the] only complaint is pain . . . stinging to [her] low back. No clinical findings were found to indicate any type of pain patient is feeling . . . ." (*Id.*)

On July 10, 2006, Plaintiff informed Mr. Miller that the "pain she experiences is the same as the initial evaluation . . . ." (Tr. at 285.) Nonetheless, she stated that "during ambulation . . . she no longer has pain that causes shooting up her leg, and she reports that she no longer feels like she is limping." (*Id.*) Strength and motion exercises measured the same results as the last session. (*Id.*) Mr. Miller noted,

> Patient appears to continue to increase in strength and range of motion, however, subjectively, patient reports that pain is still pretty significant; complaining that pain is still mostly intense throughout the hips and lower extremity. [Her] [l]owback seems to be resolving after the surgery, and with stretches and strengthening exercises.

(*Id.*) The final notes from treatments in 2006, written on July 28, contain a short summary of her treatment: "Patient states that she is active with child care responsibilities. [She] [s]tates that prolonged weightbearing activity remains problematic. Patient does carry out exercises in therapy,

however, [she] does complain of continued discomfort with exercise and stretching despite manual muscle testing of 5/5 in all planes." (Tr. at 287.)

By her next visit with Dr. Kurz, on July 25, her condition had begun to retrogress. (Tr. at 303.) In particular, pain reemerged in her legs, more than in her lower back, and increased when she stood or walked. (*Id.*) With one week of sessions remaining, Plaintiff felt that physical therapy had reached the limits of its usefulness. (*Id.*) Additionally, she had ceased taking pain medication. (*Id.*) Dr. Kurz did not find any changes in his examination or in recent x-rays, and said somewhat cryptically, "I do not really see anything particular here." (*Id.*) He placed her on Lyrica and contemplated increasing the dose or ordering an EMG if the pain did not improve.[3] (*Id.*)

Plaintiff returned to her job at Meijer in October 2006 with a thirty-pound lifting restriction, but told Dr. Kurz on October 24 that her "pain [was] so bad she can barely do anything." (Tr. at 302.) Lyrica and a TENS "help[ed] her a little bit." (*Id.*) She walked slowly and had limited lumbar motion, yet she appeared normal by all other measures. (*Id.*) She informed Dr. Kurz that another physician completed an EMG in September and "told [her] it was normal." (*Id.*) An MRI from September "suggest[ed] there is some scar tissue around the epidural region," Dr. Kurz observed. (*Id.*) X-rays of the L4-S1 instrumentation and L5-S1 fusion showed they were "doing pretty good," though the L4-5 discs looked less fused. (*Id.*) Dr. Kurz recommended stricter work limitations: "a three month work restriction of no repetitive bending, squatting, stooping, twisting, lifting, and climbing. She should have a sit-stand option, and no lifting greater than 10 pounds." (*Id.*) A corset and certain anti-depressants would also alleviate pain, he added. (*Id.*)

---

[3] Plaintiff apparently saw another orthopaedic surgeon in September of 2006 at Meijer's request. (Tr. at 268.) The only evidence of this in the Record consists of a letter from the surgeon, Dr. Paul Drouillard, reminding Plaintiff of her visit. (*Id.*)

12

She began taking an anti-depressant, Cymbalta, and by the following visit she proclaimed that her numbness and tingling occurred only occasionally. (Tr. at 301.) She stopped taking Lyrica without noticing any difference. (*Id.*) Dr. Kruz's examination show modest improvements: her ambulation was now "fine" and her lumbar motion was "a little bit improved." (*Id.*) She intended to keep working with the "present" restrictions for another six months–it is not clear what those restrictions were–because without them, Dr. Kruz thought she was incapable of working. (*Id.*)

The Record then jumps to April 19, 2007, when Plaintiff was back to working forty hours per weak with "quite a bit of pain," numbness, and tingling. (Tr. at 300.) Cymbalta helped, but not enough, and she no longer took Lyrica. (*Id.*) Dr. Kurz thought her "[a]mbulation [was] fine, but a little slow," and her "[l]umbar motion [was] still rather limited." (*Id.*) X-rays, however, showed "stability" in the L4-S1 region, the same area that troubled her. (*Id.*) He began to suspect pseudarthrosis, and accordingly ordered a CT scan and prescribed Neurontin. (*Id.*) The scan showed that the bilateral transpedicle screws were in place and that the "alignment of [the] lumbar sacral spine [was] unremarkable." (Tr. at 274, 277.) The radiologist suspected "mild disc protrusion" on the left side at L4-L5 and moderate protrusion at L5-S1. (*Id.*)

Nothing had changed by the next appointment two months later. (Tr. at 299.) Plaintiff decreased the Neorontin dosage because it caused her to become somnolent, but Dr. Kurz encourage her to slowly double the amount she currently took. (*Id.*) A "re-do surgery on her pseudoarthrosis" seemed likely to Dr. Kurz if she did not improve by the next visit. (*Id.*) This was unfortunately the case, and during the July 17 visit objective evidence supported Plaintiff's description of "unrelenting" pain: her gait was slow, her hamstring was "a little bit tight," and the

lumbar x-rays and CT scan "show[ed] what appears to [have been] pseudarthrosis at L4-5 and L5-S1." (Tr. at 298.) They decided to proceed with the "re-do surgery." (Tr. at 298-99.)

Plaintiff checked into William Beaumont Hospital on August 8 for an L4 to S1 revision laminectomy and posterior spinal fusion with iliac crest bone graft. (Tr. at 269-72.) The surgery went well; Dr. Kurz removed the old screws, which were "reasonably tight" and had not violated the pedicles,(Tr. at 271), and replaced them with new screws in "[e]xcellent . . . location and alignment . . . ." (Tr. at 271-72.) She began physical therapy in the hospital before leaving on August 10, with a prescription for Lortab effectively controlling her pain. (*Id.*) A week later, however, Plaintiff told Dr. Kruz that there had been "no real changes," though she now ambulated well and had no observable abnormalities. (Tr. at 297.) Dr. Kurz reviewed x-rays showing the instrumentation was in place and told her to "increase ambulation" and return in one month. (*Id.*)

Sometime before her next appointment, on September 20, she started taking Lotrab again. (Tr. at 296.) She had "some back pain," but Dr. Kurz found she was "doing okay." (*Id.*) He intended to reintroduce gradually Neurontin and physical therapy into her treatment plan. (*Id.*) She "continue[d] to improve slowly" through the following visit on November 20, telling Dr. Kurz that leg numbness, tingling, and pain had diminished. (Tr. at 295.) Her gait was "fine" and the other test results were unchanged. (*Id.*) Dr. Kurz planned to "get her into physical therapy for 6 weeks" and tweak her medications to slowly decrease Lortab dosages. (*Id.*)

Physical therapy sessions with Mr. Miller began on November 28. (Tr. at 283.) She rated her pain at level seven on the VA scale, told Mr. Miller it disrupted her sleep, noted that her calf cramped and twitched, and reported "sensory deficits in the [left] lateral thigh and calf to her foot . . . ." (*Id.*) He confirmed the sensory deficits and observed a few of the same issues from her last

round of therapy, such as a forward flexed posture; but her strength continued to be normal. (*Id.*) She could not carry out daily activities without pain: she hurt while dressing, performing personal care, driving, and acting as a Girl Scout troop mother. (*Id.*)

Over the next month, she received nine physical therapy sessions. (Tr. at 281.) Mr. Miller assessed her condition on December 28, finding that she "made very little progress with physical therapy, still experiencing constant pain of 8/10." (*Id.*) She also seemed "to have lost some strength in the hip and knee since the initial evaluation." (*Id.*) Plaintiff estimated that she could stand for fifteen minutes, walk ten to fifteen minutes, and sit for thirty minutes. (*Id.*) Mr. Miller planned to continue treatment for a few additional weeks. (Tr. at 282.)

On January 8, 2008, Plaintiff again visited Dr. Kurz. (Tr. at 294.) He wrote that physical therapy "was helping her," but the massage methods used in one session inflamed her left lower back. (*Id.*) Her gait had slowed, tenderness developed around the inflamed area, and her lumbar motion decreased; Dr. Kruz discerned no other changes and consequently advised continuing physical therapy but avoiding massage. (*Id.*)

By March 4, 2008, she complained of having "good days and bad day, but most of her days . . . are bad." (Tr. at 293.) None of the objective measures had changed from the prior report. (*Id.*) In tears, she expressed that her impending return to work caused "tremendous . . . stress," claiming that her employer was "trying to railroad her back into working too soon and she [said] almost any activity is causing her pain. . . . She [said] that she [was] afraid to go back to work, as she [felt] they [were] not going to honor any restrictions." (*Id.*) None of Dr. Kurz's objective measures had changed from the prior report. (*Id.*) He addressed her concerns not with medical advice, but rather with practical counsel: "the best way to take care of this," he told her, would be "to get an

independent evaluation which would include a functional capacities evaluation. . . . [B]ased on that I will make recommendations for restrictions at work, and she will call me after that." (*Id.*) Instead, Plaintiff did not come back to Dr. Kurz until after filing her disability claim in 2011. (Tr. at 169, 319.)

The ALJ allowed Plaintiff to submit additional evidence after the hearing but prior to the written decision, including reports from two appointments, CT scan results, and deposition testimony from Dr. Kurz. (Tr. at 46-48.) During the November 23, 2011 visit to Dr. Kurz, Plaintiff reported that she had improved after her second surgery, but quickly began wrestling with chronic pain again and, in July 2008 she started falling down. (Tr. at 319.) Her lower back pain persisted, moving into her right leg. (*Id.*) Her pain level was at ten out of ten on the VA scale, and getting worse. (*Id.*) She tested normal for strength, flexibility, coordination, mood, and reflexes. (*Id.*) MRIs revealed that screws from the spinal fusion had broken, but Dr. Kurz did "not see significant displacement." (Tr. at 320.) He also thought "she might have a solid arthrodesis, but it [was] difficult to tell with the instrumentation in place." (*Id.*) He diagnosed bilateral lumbar radiculopathy and low-back pain and recommended more imaging studies and a CT scan. (*Id.*) He also hoped that she would find a different anti-depressant, such as Cymbalta, because "she [was] obviously depressed . . . ." (*Id.*) The CT scan on December 1 showed a lesion on Plaintiff's left iliac bone, focal disc bulging at L5-S, and a "mild posterior disc bulge at L4-S." (*Id.*)

The final medical report in the Record is from a visit with Dr. Kurz on December 20. (Tr. at 321.) Her pain specialist, who remained nameless, doubled her Neurontin dosage, which helped to bring her pain down to as low as four on the VA scale. (*Id.*) The notes report, "[s]he does not really have too much numbness and tingling, or any pain. It seems to have settled down. The pain

is more of an ache; and sometimes it is burning. It looks to me like she is in much better spirits today." (*Id.*) The objective testing displayed normal results, and Dr. Kurz concluded "[t]here is really nothing further I need to do for her. She will call me as necessary." (*Id.*)

On January 13, 2012, Plaintiff's attorney deposed Dr. Kurz. (Tr. at 323-40.) He testified that he performed two "extensive" surgeries on her back and that she was a current patient. (Tr. at 327-28.) However, the two visits in the winter of 2011 were the only times he saw her since March, 2008. (Tr. at 328.) He then testified that Plaintiff's medical condition equaled musculoskeletal system listings 1.04(A) and (B): she had evidence of nerve root compression, documented by an EMG, an MRI, and her subjective complaints; she had "an element of spinal arachnoiditis . . . documented on a lumbar MRI scan that [Dr. Kurz] believe[d] was done in 2006 . . . and that showed evidence of significant epidural fibrosis, which is the same thing as spinal arachnoiditis." (Tr. at 329.) He found Plaintiff "very reliable" because she complied with his recommendations "within a reasonable amount of time . . . ." (Tr. at 331.) Plaintiff's physical pains produced depression, which could significantly affect her ability to concentrate, focus, and remember. (Tr. at 337.)

He further opined that her condition would have continued after March 2008 through the present. (Tr. at 332.) The pain persisted after the first surgery because, as shown by a CT scan, "clearly she had not fused the spine properly . . . ." (*Id.*) The pseudoarthrosis–which Dr. Kurz defined as incomplete fusing–was present even after the second surgery. (Tr. at 332-33.) He qualified this, however, noting that at his last appointment in March 2008, it "would [have been] too early for the pseudoarthrosis to have been completely healed and repaired." (Tr. at 333.) He was confident that her complaints of pain relating to the period 2008 through 2010 stemmed from

17

the conditions that he diagnosed in March 2008. (Tr. at 336.) His recent examinations in 2011 verified his opinions, he stated, and showed that "if anything, she was worse" now than in 2008. (Tr. at 338.)

Her significant difficulties walking, sitting, and standing "prevented her from doing any reasonable functional activity. . . . [A]nd therefore all the inactivity . . . was consistent with her symptoms and also necessitated by the severe pain that she was in." (Tr. at 332.) In short, she could not be gainfully employed unless she found a job allowing her to lie down in bed most of the day. (Tr. at 333-34.) A sit-stand option would be unavailing because she could only sit or stand for ten to fifteen minutes. (Tr. at 334.)

The Function Report Plaintiff completed in March 2011 depicted her daily routine: she brought her children to school, showered, cleaned her home for up to four hours per day, washed clothes, rested, watched television, fetched the children from school, assisted with homework, and prepared dinner. (Tr. at 200.) She described a few troubles with personal care caused by her back, mostly dealing with bending, but could nonetheless handle each task without help. (Tr. at 200-01.) She also went outside "at least once a day"; handled her finances; shopped, with help; participated in a few social activities; followed instructions and authority figures well; had no problems concentrating or remembering information, but needed help completing tasks; and did not use any assistive devices. (Tr. at 201-05.)

Finally, on November 22, 2011, Jennifer Turecki conducted a vocational assessment of Plaintiff. (Tr. at 229-31.) Plaintiff shifted in her chair, appeared physically uncomfortable, and cried during the session. (Tr. at 229.) Ms. Turecki reviewed Plaintiff's work history and the vocational classifications of various past jobs. (Tr. at 229-30.) "Her concentration is poor as is her

18

memory," and the pain disrupted her ability to focus. (Tr. at 230.) "She has generalized anxiety and is prone to anxiety attacks." (*Id.*) Ms. Turecki concluded that Plaintiff "has numerous symptoms of disability that are preclusive to the most basic demands of competitive employment," including her inability to focus, her anxiety attacks and crying spells, her need for unscheduled breaks, her likely absenteeism, and her need to lie down. (Tr. at 231.)

At the administrative hearing, Plaintiff's representative claimed that Plaintiff had "sparse medical treatment because . . . the best treatment she felt was to limit her activity . . . ." (Tr. at 48.) Plaintiff testified about her duties at Meijer, which included wrapping meats, stacking cases, unloading freight, cleaning, and stocking; she frequently lifted over seventy-five pounds. (Tr. at 60.) She first injured her back in 2004 unloading boxes from a skid: "I just couldn't move. I was screaming for–trying to scream for help, but it was hurting even trying to scream for the help. So I was kind of stuck there . . . ." (Tr. at 61.) She did not work again over the next two years and when she returned her new position was to monitor the gas station for customers who failed to pay–she wrote down their license plate numbers and called in her report on a special phone line. (Tr. at 62.) She "sat and stood" as she needed. (Tr. at 64.) She stayed in the position from January 2007, until her surgery in August 2007, but it was a struggle. (Tr. at 64-67.)

Plaintiff testified that she lived with her husband, two teenage children, and her sister. (Tr. at 55.) She reported doing the laundry once or twice per month. (Tr. at 56-57.) She did not need to drive "very much" and she generally spent the her days watching television. (Tr. at 69-70.) Her sister moved in after Plaintiff's 2004 accident. (Tr. at 70-71.) Plaintiff occasionally cooked, but did little else; vacuuming, for example, was too painful. (Tr. at 72.) Her older children visited multiple times each week, bringing their children to see Plaintiff. (Tr. at 72-73.)

19

Plaintiff told the ALJ that she started taking pain medication in June 2011; before that she addressed her pain by limiting her activity. (Tr. at 73-74.) Plaintiff also wanted the ALJ to consider her depression, anxiety, and panic attacks. (Tr. at 74.) Charlene Bailey, a physician's assistant, had arranged her antidepressant prescriptions for years. (Tr. at 74-75.) She began seeing Ms. Bailey in 2009, after she returned from Alabama, as a result of anxiety and panic attacks surrounding her physical problems. (Tr. at 90-91.) In addition, Plaintiff claimed poor concentration and memory, and a "really terrible" bladder. (Tr. at 75-76.) She smoked half of a pack of cigarettes per day. (Tr. at 77.)

The functional assessment she provided to the ALJ was consistent to those she gave to her physicians. (Tr. at 76-77.) She could walk around the house, sit comfortably for five to ten minutes, and lift up to a gallon of milk. (Tr. at 76-77.) She had poor balance and, she asserted, she probably should have purchased a walking device but felt that using the device would be too emotionally difficult. (Tr. at 78.) In short, she stated, "I can't even get through my daily living at home, so I don't know how I would be able to work." (Tr. at 78.)

Her attorney then took over the questioning. (Tr. at 79.) Plaintiff said that her TENS unit helped with the pain and a back brace kept her posture from sagging. (*Id.*) In July, 2008, her husband's employer transferred him to Alabama. (Tr. at 80.) She occasionally saw a physician there, obtaining a prescription from Cymbalta. (Tr. at 81.) She did not take more pain medication

> [b]ecause it just kind of masked it and I was afraid of having a drug addiction. I felt like I already had enough problems. I didn't want to have another problem because, you know, I didn't want to be addicted to drugs or my body [to] have to have drugs. Because they said once you're on them for a long time, your body feels the need to have them. And I just–I didn't want to have to go through battling a drug addiction on top of battling this pain that I have all the time. . . .

[T]he pills don't take all the pain away. The best thing to do is lay down and try to limit my activity and, you know, at my own pace to be able to do things. But the best thing is laying down.

(Tr. at 81-82.)

Plaintiff asserted that her monitor position at Meijer was developed specifically for her: "that has never been a job that was given to anyone at all ever, at any time." (Tr. at 83.) Nonetheless, "it was very hard for [her] to sit there for that amount of time," and she had to leave work early on occasion. (Tr. at 83.) If Meijer had not "force[d] [her] to go back," she felt, "maybe [her back] would have healed." (Tr. at 84.) She settled her workers' compensation case because returning to work could have led to another surgery, an emotionally daunting prospect. (Tr. at 84-85.)

Her health improved after the second surgery, but quickly worsened and grew to include her legs, feet, and gluteal muscles. (Tr. at 86.) On multiple occasions, the numbness prevented from realizing her foot was asleep and she would consequently fall down on the stairs. (Tr. at 87.) She was hesitant to see Dr. Kurz after the falls because she "was afraid because . . . if he says, you know, you hurt something or something up in here, [she] would be back in the same spot. [She] was so afraid because it was so hard to recover." (Tr. at 88.) She saw a physician "a couple times" in Alabama before returning to Michigan in 2009. (Tr. at 90.)

She then appended a list of other health issues not mentioned elsewhere or merely hinted at, that would cause her to miss work. (Tr. at 93-95.) Hand numbness and cramps caused her to drop items and prevented her from writing entire letters. (Tr. at 94.) Migraines or headaches occurred three to four times per week, lasting between hours and days. (Tr. at 95.) The Cymbalta she took during the insured period made her "groggy." (Tr. at 96.)

21

When she could shop, she used an electric cart with a seat. (Tr. at 95-96.) She drove only short distances because, she stated, "I'm afraid if my foot . . . goes numb and I don't feel it, you know, how am I going to be able to drive. I would, you know, be in an accident and I don't want to take that chance, so. It hurts to sit and drive . . . ." (Tr. at 97.) Her family did not "go out to eat," she noted, "because I don't want to have to get up and leave if I can't stay." (Tr. at 99.) She concluded that she "couldn't handle the sitting in the chair job" as a monitor at Meijer, "so [she didn't] know how [she] would have been able to do anything" else at work. (Tr. at 100.)

The attorney then clarified Plaintiff's relationship with Dr. Kurz. (Tr. at 102.) Meijer paid for Plaintiff to see him during her workers' compensation case and she continued to see him after that. (Tr. at 102-03.) Plaintiff's attorney claimed credit for the recent visits to Dr. Kurz: "[i]t was at my doing. . . . I said you need to go back to Dr. Kurz because Judge McKay's not going to have anything." (Tr. at 102.) Plaintiff had not seen Dr. Kurz since 2008, in part, because insurance no longer covered the visits. (Tr. at 103.)

The ALJ then questioned Plaintiff regarding her treatments. (Tr. at 104.) Dr. Kurz had, at one point, recommended increasing her walking, which Plaintiff claimed she tried but was too painful. (Tr. at 104-05.) She admitted that physical therapy helped, but then suggested "it started to get worse to where it was hurting [her]. So they said well, we don't want you to go home hurting. We don't want to make you worse off than what you are . . . ." (Tr. at 105.)

The VE then testified that Plaintiff's gas station monitor job would correlate with the Dictionary of Occupational Titles ("DOT") position for surveillance system monitor. (Tr. at 109.) The ALJ then posed a hypothetical to the VE, asking him to consider an individual with Plaintiff's

background who could "perform the full range of light exertional work" with a few additional restrictions:

> [The] hypothetical claimant needs to be limited to activities such as climbing stairs, crouching, crawling, kneeling, stooping, bending or twisting at the waist on an occasional basis. She needs to avoid workplace hazards such as dangerous moving machinery, unprotected heights. I . . . would preclude climbing ladders in that. And she needs to be limited to work that's simple, routine or repetitive in nature where she controls the pace of the work.

(Tr. at 110.) The VE responded that the individual could not perform Plaintiff's past work as a meat wrapper or stock clerk. (*Id.*) He was less certain, however, about the surveillance position. "Though it's simple, it's–well, it's routine," he stated. (Tr. at 110) But he added, "[i]t's something more than simple, however," both in general and how she performed it. (Tr. at 110-11.) The VE pinned his conclusions on the sporadic tempo of the work, the long periods of inactivity followed by bursts of action. (Tr. at 111.)

In any case, the VE offered "some examples" of other jobs the hypothetical individual could perform: simple assembly, packaging, and sorting jobs (10,000 in southeastern Michigan, 20,000 in Michigan); mail sorting positions (2,000 in southeastern Michigan, 4,000 in Michigan); and attendant positions (3,000 in southeastern Michigan, 6,000 in Michigan) (Tr. at 112.) If the hypothetical claimant had to sit or stand at work, she could perform the assembly, packaging, and sorting jobs reduced to 4,000 in southeastern Michigan and 8,000 statewide. (Tr. at 112-13.) Additionally, Plaintiff could perform approximately 800 of the attendant positions in southeastern Michigan, and 1,000 in the state. (Tr. at 113.)

Throwing another limitation into the hypothetical, the ALJ asked what jobs would remain with if the individual was "limited to lifting and carrying sedentary work of up to ten pounds . . . ." (Tr. at 113.) The VE noted that the parking lot attendant was formally classified as a light

23

position, but was "more performed at the sedentary exertional level" and therefore "800 jobs would

still exist." (Tr. at 113-14.) The individual could also work as an industrial processor (2,000 in

southeastern Michigan and 4,000 in Michigan). None of these jobs would require more than

occasional use of foot pedals or controls, but some would require frequent contact with others,

reducing the total job base by about half. (Tr. at 114.) The VE stated that more than two absences

per month precluded work, as would recurrent unscheduled breaks to lie down. (Tr. at 115.)

Finally, the VE opined that if he fully credited Ms. Moran's testimony, he would conclude that her

need for almost continuous recumbent positioning ruled out competitive employment. (Tr. at 115-

16.)

The VE then elaborated his reasoning for not labeling surveillance monitoring as simple and

routine work. (Tr. at 117.) The VE noted that many jobs with constant change, such as fast food

positions, are considered unskilled yet, in his opinion, were not simple or routine because

> things are always in flux. There are busy times, there are slower times . . . . And
> there's a lot [of] boredom and one of the challenges of those kinds of jobs is staying
> on task because of so little activity. It's just that when . . . the need for activity does
> arise, it takes it out of the simple and routine in my opinion. It . . . emotionally takes
> it to a different level.

(Tr. at 118.) The ALJ pointed out that system monitors "simply monitor the cameras, as they are,

and notify authorities by telephone if need for corrective action. They're pushing a button,

something of that nature. They're not actually putting themselves into the situation . . . ." (*Id.*) The

VE replied, "I guess I have a hard time with . . . safety or personnel violations being called routine.

That's my view on it." (*Id.*)

### F.    Analysis and Conclusions

### 1.    Legal Standards

24

The ALJ determined that during the time Plaintiff qualified for benefits, she had the residual functional capacity ("RFC") to perform a limited range of sedentary work:

> [T]he claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) that allows her to alternate between sitting and standing while engaged in work. She should avoid workplace hazards such as moving machinery, unprotected heights, or climbing ladders. Last, she is limited to work that is simple, routine, and repetitive where she is able to control the pace of the work..

(Tr. at 25.) Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a). She could accordingly perform past relevant work as a surveillance monitor and a significant number of other jobs in the regional economy. (Tr. at 25, 32.)

After review of the record, I suggest that the ALJ utilized the proper legal standard in her application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff argues the ALJ violated the treating source rule by disregarding Dr. Kurz's opinion evidence. (Doc. 10 at 10-14.) Specifically, the ALJ supposedly jettisoned Dr. Kurz's medical opinions for the ALJ's own unfounded interpretations of the medical data (*Id.* at 13-14.) Additionally, she alleges the ALJ mishandled the medical listing analysis, rejecting Dr. Kurz's opinion without any other direct expert evidence. (*Id.* at 13.) Finally, she finds error in the ALJ's treatment of the surveillance position; particularly that the ALJ characterized it as simple and routine, and also that she failed to address Plaintiff's argument that the surveillance job represented an accommodated position. (*Id.* at 14-16.)

I suggest that the substantial evidence supports the ALJ's findings at step five; however I suggest that the ALJ's listing analysis is not supported by substantial evidence. I therefore recommend granting Plaintiff's Motion, denying Defendant's Motion, and remanding for further proceedings.

### a.    Medical Sources and the RFC

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable

26

medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §

27

404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[4] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to

---

[4] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight he assigns the treating source's opinion in his written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility

29

assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(I)     [D]aily activities;

30

(ii)   The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require."

31

42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis. *Jones*, 336 F.3d at 474. In the first four steps, the claimant must prove her RFC. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to the RFC, 20 C.F.R. § 404.1560(c), and consequently the burden remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

**b.    Analysis**

1.    Dr. Kurz's Functional Capacity Opinion

Plaintiff first argues that Dr. Kurz's opinions deserved greater weight in the ALJ's RFC analysis. (Doc. 10 at 10-14.) Plaintiff presents a strong case, but ultimately fails to convince that the ALJ's thorough opinion should be reversed on this ground.

The ALJ's written decision shows her close scrutiny of the evidence and contains "good reasons" for denying Plaintiff's claim. 20 C.F.R. § 404.1527(c)(2). The ALJ stated that she considered the evidence under the relevant regulations and Social Security Rulings. (Tr. at 25.) In similar contexts, the Sixth Circuit has found such statements to approach the minimum needed to satisfy the regulations. *See, e.g.*, *White v. Comm'r of Soc. Sec.* 572 F.3d 272, 287 (6th Cir. 2009)

32

("[T]he ALJ expressly stated that she had considered S.S.R. 97-7p, which details the factors to address in assessing credibility. There is no indication that the ALJ failed to do so," and therefore the ALJ's credibility determination was upheld.) In any case, the ALJ went on to describe substantial sections of the medical evidence, highlighting information relevant to the factors in 20 C.F.R. §§ 404.1527(c). (Tr. at 25-32.)

First, the ALJ began by extensively examining the length and nature of Plaintiff's relationship with Dr. Kurz, 20 C.F.R. § 404.1527(c)(2), the most significant feature being the three and one-half year gap between her last appointment during her insured status, in March 2008, and the recent visits beginning in November 2011. (Tr. at 27.) Plaintiff assured the ALJ at the hearing that the interim period was filled with at least a few visits to other doctors, (Tr. at 90-91), but the ALJ noted that no reports or other evidence from them ever found their way into the Record. (Tr. at 27-28.)

The ALJ was justifiably skeptical of Plaintiff's explanation for dropping treatment with Dr. Kurz and, apparently, all other physicians: she testified that strict torpidity provided the best pain relief. (Tr. at 73-74.) This regimen, the ALJ observed, was entirely self-prescribed, without any basis in the treatment notes, and, in fact, contrary to Dr. Kurz's last instructions in March 2008 to obtain a CT scan and a functional capacity evaluation. (Tr. at 27-28.) Her return to Dr. Kurz likewise occurred on less than convincing terms–at her attorney's prodding. (Tr. at 28.) Finally, the ALJ considered the relationship's denouement, coming after Plaintiff reported to Dr. Kurz contradictory but generally positive improvements, decided to continue seeing a pain management specialist–another phantom physician without reports in the Record–and to call Dr. Kurz only as

33

needed. (Tr. at 28-29, 321-22.) The relationship was doubtlessly extensive; but the ALJ had ample evidence of inexplicably sporadic treatment to support his findings.

The ALJ also properly analyzed the supportability and consistency of Dr. Kurz's opinions.[5] (Tr. at 29.) He provided only a single capacity opinion during his treatments, which suggested temporary restrictions on weight, limits on certain movements, and a sit-stand option. (Tr. at 302.) During another appointment, he opined that undefined work restrictions were probably necessary for her to continue working–displaying his opinion that she could work. (Tr. at 301.)

In 2011, his memory refreshed by two visits and one CT scan, he constructed a restrictive, but still vague capacity report: she could not walk "for any significant length of time," "sit for a long time," or do "any reasonable functional activity." (Tr. at 331.) Instead, she needed to rest on the couch or in bed "for a significant period of time." (*Id.*) He conjectured that these limitations applied over the long period when she stopped visiting him. (Tr. at 332.) In the contemporaneous notes from March 2008, however, he appeared reluctant to hazard any guesses regarding her capacities, instead requesting she first get an opinion from someone else. (Tr. at 293.) And, as the ALJ pointed out, he never recommended limiting her activity during the insured status period. (Tr. at 29.) In fact, neither he nor any other source frequently saw Plaintiff during the period, (Tr. at 269-73, 278-84, 293-97), and the reports cease altogether seven months into the roughly two and a half year insured status period. Moreover, the limitations at the deposition all appear to emanate

---

[5] In her argument to the Appeals Council, Plaintiff addressed Dr. Kurz's specialization, noting he has "authored an extremely long list of articles and book chapters . . . ." (Tr. at 263.) She did not discuss this in her brief to the Court, (Doc. 10), but the Record contains Dr. Kurz's curriculum vitae. (Tr. at 233-45.) This factor does not clearly cut one way or the other; if it adds any weight to the 2011 opinions that she lacked functional capacities, it adds the same weight to the records from the insured status period showing that he did not then consider her incapable of working. (Tr. at 302.)

34

from Plaintiff's subjective complaints, (Tr. at 332-338),[6] and accordingly are not owed deference. *Francis*, 414 F. App'x at 804.

The ALJ noted the lack of objective evidence supporting the Dr. Kurz's deposition opinion. (Tr. at 24.) At the deposition, Dr. Kurz testified that there was no evidence of proper fusion even after the second procedure, although he noted it was too soon for it to have completely healed. (Tr. at 333.) This retrospective gloss, though no doubt correct about the general healing rate, contradicts the contemporaneous evidence. X-rays one month after her second surgery showed that the screws and instruments were "in place," and Dr. Kurz told her to "increase ambulation." (Tr. at 297.) The final objective results from her insured status period, x-rays in January and March of 2008, displayed that the discs had fused and the instrumentation remained intact. (Tr. at 293-94.) In response to her continued complaints, Dr. Kruz recommended a CT scan "to make sure that she has solid arthrodesis," or fusion, (Tr. at 293), but at that point Plaintiff instead stopped the treatments for over three years, dropped her pain medications, and judged that the best route was to remain inactive. (Tr. at 73-82.)

Much of the evidence Dr. Kurz used to justify his deposition testimony came from post-insured date examinations. Yet, this evidence showed sh had normal strength, reflexes, coordination, and, with the exception of her lumbar movement, range of motion. (Tr. at 318-22.) Her CT scan seemed to suggest "solid" fusion despite broken screws and, contrary to Dr. Kurz's testimony, he wanted more scans before deciding if she had pseudarthrosis. (Tr. 318-320.) He also diagnosed L5-S1 radiculopathy for the first time, (Tr. at 320, 321), based on an EMG report that

---

[6] At the deposition, the most specific restrictions were listed by Plaintiff's attorney–explicitly from Plaintiff's own complaints–in a question; Dr. Kurz merely replied that they were consistent with her condition. (Tr. at 336.)

mentioned the condition but noted there was no "evidence of acute denervation." (Tr. at 317) Most of the other tests likewise failed to uncover neurological problems.[7]

The radiologist's report on the December CT scan further stated that there were no soft tissue abnormalities, noted the instrumentation remained in place, and characterized any disc space narrowing and bulging as "mild." (Tr. at 318.) Finally, during their last appointment, Dr. Kurz noted that her pain "seems to have settled down" and also concluded that the fusion was "solid" after reviewing the CT scan. (Tr. at 321.)

Even if these records supported her case, they are post-insured status and thus "generally not relevant" unless they "establish that an impairment existed continuously and in the same degree from the date the insured status expired." *Collins v. Astrue*, No. 3:12-cv-089, 2013 WL 80363, at *3 (S.D. Ohio Jan. 7, 2013) (citing *Bogle v. Sec. of Health & Human Servs.*, 998 F.2d 342 (6th Cir. 1993); *Johnson v. Sec. of Health & Human Servs.*, 679 F.2d 605 (6th Cir. 1982); *Bagby v. Harris*, 650 F.2d 836 (6th Cir. 1981)). "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Social Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004). In order for evidence of the plaintiff's condition after the date last insured to be

---

[7] Dr. Schechet assessed radiculopathy in April 2005, after observing tension signs in her left lower back, though she could walk well on her heels and toes. (Tr. at 311, 315.) He appears to have dropped this diagnosis in the later sessions, where her neurologic exam results were normal. (Tr. at 308-09.) Plaintiff's physical examination results were consistently normal, and thus they did not "elucidate motor, sensory, or reflex abnormalities in a radicular distribution," the goal of the examination. Andrew W. Tarulli & Elizabeth M. Raynor, *Lumbosacral Radiculopathy*, 25 Neurologic Clinics 387, 390 (2007). Moreover, monoradiculopathy at almost every root level in the lumbosacral region is generally associated with motor abnormalities or weaknesses not present in Plaintiff, although Dr. Kurz appears to have diagnosed polyradiculopathy. *See id.* at 391. The CT scan in December, 2011 displayed a lesion on the left iliac bone, (Tr. at 318), a possible sign of L5-S1 radiculopathy, Tarulli & Raynor, *supra* at 390, 392, but Dr. Kurz assessed radiculopathy before the scan. (Tr. at 321.) Plaintiff also presented with "some numbness" in her right leg, another indication of radiculopathy. Samir D. Bhangle, et al., *Back Pain Made Simple: An Approach Based on Principles and Evidence*, 76 Cleveland Clinic J. of Med. 393, 396 (2009) ("Detecting and locating the cause of radiculopathy may be helpful. . . . In L5-S1 disk herniation, the S1 nerve root is involved, presenting as numbness and hypalagesia in the fifth toe, lateral aspect of the foot, sole, and posterolateral calf and thigh.") But again, Dr. Kurz observed no instability or tenderness on the lumbosacral spine. (Tr. at 319.)

36

relevant, the evidence "must relate back to the claimant's condition prior to the expiration of her date last insured." *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003). Dr. Kurz's deposition opinion purports to stretch back through the insured period, ostensibly qualifying it for consideration. (Tr. at 335-36.) But the ALJ was not required to ignore the substantial temporal gap between the opinion and the last insured date.

In any case, Dr. Kurz never links the objective evidence to demonstrable effects on Plaintiff's functioning–in fact, he discusses x-ray and imaging results next to observations of Plaintiff's relatively normal strength, gait, and reflexes, suggesting any impairments were not incompatible with some level of activity. His treatment notes fail to detail problems with walking, sitting, or standing. (*Id.*) Her gait was sometimes slow, (Tr. at 294, 298, 299, 300, 302, 305), but usually "fine" (Tr. at 295, 297, 300, 301, 303, 304, 306, 307, 312, 315), and her strength, reflexes, and range of motion were consistently normal.[8] (Tr. at 281-307, 314-15.) And as noted, he twice indicated that Plaintiff could work with restrictions. (Tr. at 301, 302.)

Finally, the ALJ considered other factors supporting her analysis. In particular, she found considerable support for her conclusions in Plaintiff's contradictory statements. (Tr. at 30-31.) The relatively bustling routine Plaintiff described in her Function Report, (Tr. at 200-205), clashed with medical reports and the picture of inertia she painted at the hearing. (Tr. at 30-31.) She could barely walk or stand for any length of time, but was never prescribed an assistive device. (Tr. at 30.) Her sister had assumed all household chores since she came to stay in 2004, but Plaintiff forgot to mention her in the Function Report. (*Id.*) Her restrictions were largely self-imposed: she

_____

[8] The ALJ could have also drawn upon the physical therapy records from 2006 and 2007, (Tr. at 284-91), revealing that she "had full range of motion, as well as strength, and [the] only complaint is pain . . . stinging to [her] low back. No clinical findings were found to indicate any type of pain patient is feeling." (Tr. at 289.)

stayed inactive for a lengthy period after the second surgery, though Dr. Kurz recommended increasing her ambulation; fear of a numb foot kept her from driving often, but nothing suggests she experienced this problem. (Tr. at 30-31.)

Critically, the lacunae in the Record were all of her own making. She seems to have slipped off the medical grid for the majority of her insured status period, offering no proof from this time that she was disabled. (Tr. at 73-74, 80-81.) The ALJ held the Record open for an extended period, allowing her to fill the first gap by submitting reports from her medical sources. (Tr. at 45-52.) She failed to submit these records.

The absence of any indication she sought pain treatment after 2008 is similarly telling. She stopped using pain medication, she asserted, because it "just kind of masked" the pain and could become addictive. (Tr. at 81-82.) Pain medication, of course, works by "masking" pain, and thus it may not have been a panacea, but neither was it a cheap nostrum. And while a healthy fear of addiction might be admirable, without even an inkling of drug dependence in the Record, it appears Plaintiff had no greater reason to fear it than she had of choking on pain pills or developing infections at cortisone injection sites.

Plaintiff clearly suffered significant pain–only a dedicated malingerer would have body parts fused, separated, then re-fused just to avoid work. Nonetheless, the Record does not establish that she is entitled to remand due to any errors in the ALJ's RFC, and I accordingly recommend this part of her claim be denied.

    2.    Dr. Kurz's Listing Opinion

The other, larger part of Plaintiff's argument attacks the ALJ's Listing decision. (Doc. 10 at 10-14; Doc. 15 at 2.) This claim has enough merit to warrant remand, although it seems in all probability not enough to prevail upon remand.

Claimants with severe impairments that meet or equal a listing in the Appendix are deemed disabled without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Fitting a claimant into a listing is dispositive and thus demands a higher level of proof: listed impairments preclude any gainful activity, not just substantial gainful activity. *See Zebley*, 493 U.S. at 525; 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet the listing. *Id. See also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does no qualify."). Alternatively, medical equivalence to a Listing can occur in three situations where the claimant fails to meet all of the criteria:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 n.2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526).

The ALJ retains her discretion at this stage, and does not need to attach "any special significance to the source of a[] [medical] opinion . . . [regarding] whether an impairment meets or equals a listing." 20 C.F.R. § 404.1527(d)(3). This is particularly true for the first part of the analysis: "'[A]n ALJ is capable of reviewing records to determine whether a claimant's ailments

*meet* the Listings . . . .'" *Stratton v. Astrue*, 987 F. Supp.2d 135, 148 (D. N.H. 2012) (quoting *Galloway v. Astrue*, No. H-07-01646, 2008 WL 8053508, at *5 (S.D. Tex. May 23, 2008)). The Commissioner, however, has qualified the ALJ's discretion to decide equivalence, noting that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3.

Plaintiff's argument weaves together various legal strands to claim, in essence, that the Record lacked an expert opinion on equivalence. (Doc. 10 at 11-13.) It is not entirely clear whether Plaintiff's contention is premised on the absence of a Commissioner-designated expert's review of the Listing, or the fact that the ALJ gave no weight to the treating source's equivalence discussion, the only such analysis in the Record. It is true that the Commissioner's medical consultant declined to make an equivalence finding, citing insufficient evidence. (Tr. at 128, 131.) The ALJ's decision is consequently in the unusual position of relying on–but completely rejecting–Plaintiff's own expert, who was the sole source of equivalence analysis.

SSR 96-6p and the regulations imply that an appointed expert must provide the equivalence opinion. The Commissioner promises to weigh equivalence, in part, by "consider[ing] the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c). These sources include "any medical . . . consultant employed or engaged to make medical judgments by the Social Security Administration" who also qualifies as an acceptable medical source under 20 C.F.R. § 404.1513. *Id.* § 404.1526(d). A "medical consultant," in turn, is defined as "a person who is . . .  a member of a team that makes

disability determinations" for the Administration. *Id.* § 404.1615(a). The Ruling similarly limits its discussion to "medical . . . consultants," implying they are required regardless of other expert equivalence reports but never wholly rejecting the possibility that other expert opinions on Listing equivalence could suffice. SSR 96-6p, 1996 WL 374180, at *2.

Courts generally remand only if the Record contains no equivalence opinion whatsoever. *See, e.g.*, *Reynolds*, 424 F. App'x at 415 ("No analysis whatsoever was done as to whether [the claimant's] physical impairments . . . met or equaled a Listing . . . despite [the ALJ's] introduction concluding they did not."); *Retka v. Comm'r of Soc. Sec.*, 70 F.3d 1272, 1995 WL 697215, at *2 (6th Cir. 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made.") (unpublished table decision); *Trainor v. Comm'r of Soc. Sec.*, No. 13-10093, 2014 WL 988993, at *23-25 (E.D. Mich. Mar. 13, 2014) (remanding where no expert opinion on equivalence existed) (adopting report and recommendation); *Klink v. Comm'r of Soc. Sec.*, No. 12-15172, 2014 WL 902707, at *8 (E.D. Mich. Mar. 7, 2014) (same) (adopting report and recommendation); *Thomas v. Comm'r of Soc. Sec.*, No. 12-14758, 2014 WL 688197, at *8-9 (E.D. Mich. Feb. 21, 2014) (same) (adopting report and recommendation); *Roberts v. Comm'r of Soc. Sec.*, No. 12-14661, 2013 WL 6062018, at *11-14 (E.D. Mich. Nov. 18, 2013) (same) (adopting report and recommendation); *Zaft v. Comm'r of Soc. Sec.*, No. 12-13415, 2013 WL 5340772, at *12 n.2 (E.D. Mich. Sept. 23, 2013) ("The great weight of authority holds that a record lacking any medical advisor opinion on equivalency requires a remand.") (adopting report and recommendation); *Fensterer v. Comm'r of Soc. Sec.*, No. 12-13166, 2013 WL 4029049, at *8-10 (E.D. Mich. Aug. 7, 2013) (same) (adopting report and recommendation); *McPhee v. Comm'r of Soc. Sec.*, No. 12-cv-13931, 2013 WL 3224420, at *15 (E.D. Mich. June 25, 2013) (same)

(adopting report and recommendation); *Stratton*, 987 F. Supp.2d 135 (providing a detailed discussion of the case law); *Smith v. Comm'r of Soc. Sec.*, No. 11-14429, 2012 WL 4897364, at *6-7 (E.D. Mich. Sept. 14, 2012) (same) (report and recommendation).

Courts also remand if the only opinion in the record came from an unacceptable source. *See, e.g.*, *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at * (E.D. Mich. Sept. 25, 2013) (holding that the opinion of a non-physician single decision-maker was not a state agency opinion by an expert); *Maynard v. Astrue*, No. 11-12221, 2012 WL 5471150, at *6-7 (E.D. Mich. Nov. 9, 2012) (same); *Dorrough v. Comm'r of Soc. Sec.*, No. 11-12447, 2012 WL 4513621, at *2 (E.D. Mich. Oct. 2, 2012) (remanding where the ALJ erroneously believed the record contained the necessary medical opinion).[9]

Ultimately, the courts are concerned with preventing the ALJ from making complex medical determinations; thus the cases simply ask whether the record contains expert evidence and whether the ALJ adequately addresses this evidence in her opinion. *See, e.g.*, *Manson v. Comm'r of Soc. Sec.*, No. 12-11473, 2013 WL 3456960, at *12 (E.D. Mich. July 9, 2013) (remanding because "'[n]either the ALJ nor [the] court possesses the requisite medical expertise to determine if [Plaintiff's] impairments . . . in combination equal one of the Commissioner's listings.'" (quoting *Harris v. Comm'r of Soc. Sec.*, No. 12-10387, 2013 WL 192301, at *8 (E.D. Mich. Mar. 22, 2013)) (adopting report and recommendation).

---

[9] Authority for the proposition that a non-physician can issue the equivalence opinion exists, *Gallagher v. Comm'r of Soc. Sec.*, No. 10-cv-12498, 2011 WL 3841632 (E.D. Mich. Mar. 29, 2011) (report and recommendation); *Timm v. Comm'r of Soc. Sec.*, No. 10-cv-10594, 2011 WL 846059 (E.D. Mich. Feb. 14, 2011) (report and recommendation), but is routinely disregarded as unpersuasive. *See, e.g.*, *Fowler*, 2013 WL 5372883, at *4 n.9 (finding the cases unpersuasive).

In short, the ALJ must "give an explained conclusion . . . in order to facilitate meaningful judicial review." *Reynolds*, 424 F. App'x at 415-16. *See also Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) ("The omission of any discussion of [claimant's] impairments in conjunction with the listings frustrates any attempt at judicial review . . . ."); *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 (3d Cir. 2000) ("Because we have no way to review the ALJ's hopelessly inadequate step three ruling, we will vacate and remand the case . . . ."); *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) ("[A] bare conclusion [at step three] is beyond meaningful judicial review.").

The ALJ's step-three explanation is held to the same standard as the rest of the decision, and the ALJ does not need to "spell[] out every consideration that went into the step three determination" or recount every fact discussed elsewhere in the decision. *Bledsoe v. Barnhart*, 165 F. A'ppx 408, 411 (6th Cir. 2006). *See also Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (noting that the ALJ does not need "to use particular language or adhere to a particular format in conducting his analysis").

The claimant retains the burden of proof at step three and therefore, as the Third Circuit has observed, the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that she meets the Listing. *Ballardo v. Barnhart*, 68 F. App'x 337, 339 (3d Cir. 2003) (finding that a conclusory, single-sentence analysis was adequate where the claimant "presented essentially no medical evidence of a severe impairment"). In *Retka v. Commissioner of Social Security*, decided before SSR 96-6p was issued, the Sixth Circuit's analysis somewhat opaquely adumbrated *Ballardo*. 70 F.3d 1272, 1995 WL 697215, at *2 (6th Cir. 1995) (unpublished table decision). The Sixth Circuit noted the need for expert opinions on equivalence, but quickly shifted

43

the focus to the "claimant's burden . . . to bring forth evidence to establish that he or she meets or equals a listed impairment." *Id.* The ALJ had scoured the record, found that the plaintiff had produced no evidence supporting disabling pain, and thus the Court rejected the argument. *Id.* "The absence in the record of medical evidence showing significant neurological deficits and muscle atrophy supports the ALJ's conclusion . . . . [And] [t]hus, there is no merit to the plaintiff's argument that the ALJ erred in failing to find his condition equivalent to the Listing . . . ." *Id.* Consequently, an ALJ's Listing analysis must be viewed in light of the evidence the claimant presents.

Thus, courts have upheld ALJs when their findings were supported by non-commissioner designated medical sources. In *Tapp v. Astrue*, though the record was reviewed by others, the ALJ relied at least in part, if not in whole, on non-Commissioner designated sources, finding the listing was not met or equaled. No. 10-270-GWU, 2011 WL 4565790, at *5-6 (E.D. Ky. Sept. 29, 2011). The court concluded that the ALJ's well-supported discussion was adequate. *See also Jones*, 364 F.3d at 504-505 (noting that treatment records provided substantial evidence that the claimant failed to meet the Listing).

Despite the ALJ's thorough analysis, the Record simply lacks sufficient evidence for a layperson like the ALJ to make any decision on equivalence.[10] The ALJ's findings chipped away

---

[10] Though there is some ambiguity in Plaintiff's argument, the Court is treating her objection to the findings as an objection to the ALJ's equivalence analysis and not the ALJ's finding that the impairment failed to meet the listings. Accurately describing the difference is more than a mere pedantic pursuit: the ALJ does not need expert opinions to decide whether the impairment "meets" a listing, only whether it equals one. SSR 96-6p, 1996 WL 374180, at *1-4. As one court noted,

> [T]he basic principle behind SSR 96-6p is that while an ALJ is capable of reviewing records to determine whether a claimant's ailments *meet* the Listings, expert assistance is crucial to the ALJ's determination of whether a claimant's ailments are *equivalent to* the Listings. *See Frank [v. Barnhart]*, 455 F. Supp.2d [554,] 558 & n.3 [(E.D. Tex. 2006)]. This is presumably because making an equivalency finding requires difficult medical judgments as to the severity of a

at the case for equivalence; but she could not gather any affirmative expert support to demonstrate that Plaintiff's impairment was not as severe as the Listing. I suggest the proper remedy, then, is remand for further investigation.

Plaintiff argued to the ALJ, the Appeals Council, and now to this Court that her impairments met or equaled Listing 1.04(A) and (B). (Tr. at 225, 258-59, 261-66; Doc. 10 at 10-13.) To meet that Listing, the claimant must show "compromise of a nerve root" and either

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imagining manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours . . . .

20 C.F.R. pt. 404, subpt. P, App. 1. Plaintiff claims that Dr. Kurz's deposition testimony proves her impairments met or equaled the Listing. (Doc. 10 at 10-13.) Once the ALJ rejected his opinion, she removed the only expert evidence on equivalence and thus had no way to anchor her findings to appropriate sources. (*Id.*)

The Sixth Circuit briefly addressed the "strict requirements" of Listings 1.04A and B in *Lawson v. Commissioner of Social Security*, 192 F. App'x 521, 529, 530 (6th Cir. 2006). The first Listing "requires a finding of limitation of motion of the spine and loss of motor reflex." *Id.* at 529. There, the plaintiff's reflexes and range of motion were normal; accordingly she did not meet that

---

claimant's ailments, judgments that are greatly assisted by consulting an expert.

*Galloway*, 2008 WL 8053508, at *5. Because remand is appropriate in any case, separating the analyses for meeting and equaling would be duplicative.

Listing. *Id.* at 529-30. Next, Listing 1.04B required specific medical proof of spinal arachnoiditis, which the plaintiff likewise failed to produce. *Id.* at 530. Finally, the Court rejected plaintiff's "bare assertion" that a physician's diagnosis of "'severe' degenerative disc disease" sufficed "in the absence of evidence of specific medical findings consistent with a particular listed impairment." *Id.*

Dr. Kurz testified that Plaintiff's condition met or equaled Listing 1.04(A) and (B) for a few reasons. (Tr. at 328-31.) First, he stated that an EMG and a lumbar MRI scan documented the nerve root compression by demonstrating a neuro-anatomic distribution of pain in L5-S1. (Tr. at 329.) He did not identify the date of the EMG or the MRI; however he then gave his second reason for his conclusions, stating that an MRI, which he "believe[d]" was from 2006," showed the Plaintiff "did have an element of spinal arachnoiditis," also called epidural fibrosis. (Tr. at 329-30.)

These two pieces of evidence, the EMG and MRI, proved contentious. As the ALJ noted, the only EMG in the Record came from 2011, and it merely showed "[c]hronic appearing bilateral L5-S1 radiculopathy without any evidence of acute denervation. There is no evidence of generalized peripheral neuropathy, isolated mononeuropathy, or myopathy." (Tr. at 317.) The only other mention of an EMG in the Record was Plaintiff's unsubstantiated report to Dr. Kurz, documented in his notes, that another physician ordered an EMG and deemed the results "normal." (Tr. at 302.) It is thus unclear whether the evidence in the Record shows nerve root compression.

Cases discussing this impairment vary in their analyses. Some look for concrete proof of actual compression, rather than mere suggestions that a nerve root is affected, to trigger further inquiry or otherwise support the claimant. *See, e.g.*, *Adams v. Comm'r of Soc. Sec.*, No. 13-11132, 2014 WL 897381, at *9 n.5 (E.D. Mich. Mar. 6, 2014) (noting that recent MRI results would not

have altered the ALJ's decision on nerve root compression because they "indicate only that a disc protrusion '*abuts* the S1 nerve roots,' not that there is evidence of nerve root *compression*") (adopting report and recommendation); *Barnes v. Comm'r of Soc. Sec.*, No. 12-CV-15256, 2013 WL 6328835, at *9 (E.D. Mich. Dec. 5, 2013) ("[Claimant's] x-ray and CT scan show degenerative disc disease and spinal canal stenosis, but there is no mention of nerve root compression in the radiologist's reports.") Others treat a broader range of descriptions in the treatment notes as representing compression. *See, e.g.*, *Thomas*, 2014 WL 688197, at *6-8 (finding that nerve root impingement was equal to nerve root compression).

Contrary to the ALJ's assertion, the EMG did provide evidence of potential nerve compression, but not enough for the ALJ to make any findings without additional expert guidance. The evidence Dr. Kurz cited at least suggested the possibility of nerve root compression, and when the ALJ rejected Dr. Kurz's opinion she left the Record without any expert interpretation of complex medical information. Radiculopathy is a "[d]isease of the roots of spinal nerves." *Blakiston's Gould Medical Dictionary* 1148 (4th ed. 1979). *See also* J.E. Schmidt, 5 *Attorneys' Dictionary of Medicine and Word Finder* R-11 (2013) (defining radiculopathy as "[a]ny disease or abnormality of a dorsal or ventral (sensory or motor) spinal nerve root from the point where it merges with the spinal cord (or brain stem) to the point where it joins its companion root"). "Most spine surgeons consider root compression to be a contributing cause of radiculopathy" in certain cases. Walter S. Bartynski & Luke Lin, *Lumbar Root Compression in the Lateral Recess: MR Imaging, Conventional Myelography, and CT Myelography Comparison with Surgical Confirmation*, 24 Am. J. Neuroradiology 348, 348 (March 2003).

47

Additionally, the absence of the other indications on the 2011 EMG–acute denervation, generalized peripheral neuropathy, isolated mononeuropathy, or myopathy–does not prove Plaintiff was free from nerve root compression. Denervation is "[t]he removal of a nerve or nerves from a part." Schmidt, 2 *Attorneys' Dictionary of Medicine and Word Finder*, *supra* at D-55. Neuropathies can be caused by root compression, but they can also arise from other conditions. Leon A. Weisberg, et al., *Essentials of Clinical Neurology* 16-4 (3d. ed. 1996). Moreover, nerve roots lack an epineurial covering, and are therefore "more at risk for compressive injuries" than are peripheral nerves." Barry Goldstein, *Anatomic Issues Related to Cervical and Lumbosacral Radiculopathy*, 13 Physical Med. Rehabilitation Clinics of N. Am. 423, 424 (2002). Peripheral neuropathy, however, consists of disorders of peripheral nerves, Schmidt, 4 *Attorneys' Dictionary of Medicine and Word Finder*, *supra* at P-182, which extend from the nerve roots. Mark H. Beers & Robert Berkow, eds., *The Merck Manual of Diagnosis and Therapy* 1485 (17th ed. 1999). Finally, myopathies relate to muscles, not nerve roots. *Blakiston's Gould Medical Dictionary*, *supra* 883. None of the foregoing is a serious attempt to assay the complicated medical evidence in the Record. Rather it merely demonstrates that Dr. Kurz's opinion had some merit, and while perhaps unpersuasive it nonetheless was unrebutted. Without additional expert interpretation, the ALJ could not gather affirmative, substantial evidence of non-equivalence.

The 2006 MRI was also critical, providing evidence of two vital Listing elements: nerve root compression and spinal arachnoiditis. Dr. Kurz testified that he viewed a lumber scan showing "evidence of significant epidural fibrosis," another term for spinal arachnoiditis, consistent with her pain, numbness, and also the EMG. (Tr. at 330.) The ALJ countered that there was no such MRI in the Record, and a 2005 MRI did not show nerve root compression. (Tr. at 24.) Defendant

48

likewise notes that the "words epidural fibrosis do not appear on the . . . [2005] MRI" and the 2006 MRI remains missing. (Doc. 13 at 15.)

If Dr. Kurz referred to the 2005 MRI, additional expert guidance is required to determine if the findings from that MRI indicate a listing-level impairment. The 2005 MRI report indeed listed only small protrusions and tears, degenerative disc change, and no stenosis. (Tr. at 276.) It is unclear to a layperson how this evidence implicates nerve root compression. Dr. Kurz thought it significant enough after viewing them that he diagnosed radiculopathy and a host of other lumbar problems, began considering invasive examinations (discograms) and procedures (spinal fusion), and sent Plaintiff to receive cortisone injections and pain treatment. (Tr. at 314-16.) The ALJ did not mention this and, in any case, gave Dr. Kurz's Listing opinion "no weight." (Tr. at 24.)

The 2006 MRI, though not in the Record, also constitutes valid evidence. The ALJ may receive evidence at the hearing "even though [it would be] inadmissible under rules of evidence applicable to court procedure." 42 U.S.C. § 405(b)(1). *See also* 20 C.F.R. § 404.950(c). The Supreme Court long ago established that hearsay evidence was not only admissible, but could constitute substantial evidence supporting the ALJ's findings. *Richardson*, 402 U.S. at 402. Plaintiff points to case law that also supports this proposition. *See Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1039 (6th Cir. 1990) ("[R]elevant evidence not admissible in court, including hearsay, is admissible at an administrative hearings."). Indeed, hearsay evidence meeting a multi-factor test can constitute substantial evidence–"the sole basis"– for an administrative decision. *Myers v. Sec'y of Health & Human Servs.*, 893 F.2d 840, 845-46 (6th Cir. 1990) (noting that under certain circumstances hearsay evidence alone can constitute substantial evidence). Even

"double hearsay" opinions are admissible. *Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 724 n.3 (6th Cir. 2004).

The 2006 MRI evidence here is potentially further removed from the source than mere "double hearsay," but not as far removed as the ALJ believed. Dr. Kurz referenced the 2006 MRI in his notes from October 24, 2006: he wrote, a "[l]umbar MRI scan 9-25-2006 that somebody else ordered . . . suggests there is some scar tissue around the epidural region.". (Tr. at 302) The evidence is thus Dr. Kurz's interpretation of an unknown individual's interpretation of MRI results. Nonetheless, it supports his testimony that Plaintiff had "epidural fibrosis, which is the same thing as spinal arachnoiditis." (Tr. at 330.) It is noteworthy, however that the minor mild tone of the original note in 2006–that the report "suggests there is some scar tissue"–morphed into "significant" tissue problems by 2012. (Tr. at 330.)

Dr. Kurz's interpretation of the 2006 MRI is nonetheless unpersuasive. Dr. Kurz suggests that Plaintiff's pain in March 2008 was consistent with "the spinal arachnoiditis that was seen on the [2006] MRI scan." (Tr. at 330.) This twists the continuity of the evidence: he attempts to bolster his opinion by pointing out that objective evidence from 2006–before her second surgery–gave credence to her subjective complaints in 2008. During the March 2008 visit, however, Dr. Kurz wanted her to get another CT scan to make sure she had "solid" fusion and a functional capacity report–this does not seem to be advice from a physician who was convinced that objective evidence corroborated subjective complaints and proved his patient was disabled. (Tr. at 293.)

Dr. Kurz's listing analysis also asserted that Plaintiff had pseudoarthrosis. (Tr. at 331-32.) While the medical reports document this issue, (Tr. at 298, 300), Dr. Kurz again drew tenuous

conclusions from the evidence. (Tr. at 333.) He testified that during the March 2008 visit "she did not have evidence of fusion," although he admits that it was "too early" for the pseudoarthrosis to have healed. (*Id.*) The x-rays at the time showed "interval fusion" and Dr. Kurz never mentioned any problems on the neurologic or reflex exams, she never tested positive on straight leg raising tests, and she never had significant ambulation or range of motion issues. (Tr. at 293-95.)

In short, the evidence for equivalence is weak, and from the perspective of a layperson, it is difficult to fathom what evidence she could cobble together to equal the listing. Her failure to provide evidence for the vast majority of her insured-status period indicates a weak case. As one court has stated

> [i]t is true that the Secretary's finding that plaintiff could perform light works is speculative. However, it is black-letter law that claimant has the burden of showing that she cannot perform her past relevant work. . . . In the instant case, no treating physician has said that plaintiff was disabled during the period in question. In view of the lack of objective evidence regarding plaintiff's residual functional capacity during that period, the Secretary had little choice but to speculate. The Secretary cannot be faulted for doing so, because it is the plaintiff who has placed the Secretary in this position, by failing to provide adequate objective evidence.

*Gayton v. Sec'y of Health & Human Servs.*, 691 F. Supp. 22, 24-24 (N.D. Ohio 1988) (citations omitted). The absence of expert opinion to support the ALJ's conclusion, however, is fatal to her findings. The errors are not harmless because additional expert guidance may have changed the outcome. *Barnes*, 2013 WL 6328835, at *8-12 (finding that failure to consult an expert on equivalence was not harmless error, which only applied if "'concrete factual and medical evidence' is 'apparent in the record' such that a court can discern how the ALJ 'would have' reasoned" (quoting *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 656-57 (6th Cir. 2009)).

3.    The ALJ's Step Four Findings

Plaintiff's final argument attacks the ALJ's treatment of the VE's testimony. In particular, she asserts that the ALJ erred by concluding the surveillance job was simple and routine and that the ALJ "failed to assign any significance" to the fact that Plaintiff's surveillance job was "made work."[11] (Doc. 10 at 15-16.) Neither of the claims has merit.

The ALJ was permitted to consult the DOT and did not need to use VE testimony. 20 C.F.R. § 404.1560(b)(2). *See also Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) ("The regulations *permit* an ALJ to use the services of a vocational expert at step four to determine whether a claimant can do his past relevant work, given his RFC." (emphasis added)). When a VE provides evidence, it "generally should be consistent with . . . the DOT." SSR 00-4p, 2000 WL 1898704, at *2. The ALJ must seek an explanation from the VE if the testimony conflicts with the DOT. *Id.* "Neither the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information." *Id.*

The ALJ properly rejected the VE's contention that the surveillance monitor position was not simple and routine. (Tr. at 32, 110-11, 117-18.) Though he initially hesitated, he found that Plaintiff's surveillance job "correlate[d]" with the relevant DOT listing and nothing suggests his choice of this verb indicated his belief that it did not actually "correlate." (Tr. at 109.) Whether he

---

[11] Plaintiff also argues that the ALJ improperly rejected the VE's testimony that no jobs existed if she needed to lie down frequently. (Doc. 10 at 14-16.) As noted above, substantial evidence supports the ALJ's RFC. The ALJ was under no obligation to base her findings on a limitation she properly rejected.

thought Plaintiff's past work fit the position or not, he thus at least suggested it matched the position's outlines.

The section of the VE's testimony Plaintiff relies on is unconvincing on its face. He first testified that the position was simple and routine, both as she performed it and as it is generally performed. (Tr. at 110-11.) He then said it was not routine because "anomaly situations" could arise, and it was "[n]ot necessarily" simple either. (Tr. at 111.) It was not simple, he later explained, in the same way that work in fast food restaurants was not simple–because the tempo varied and job assignments changed. (Tr. at 117-18.) A surveillance monitor would likewise have lots of slow times followed by bursts of activity–this "emotionally takes it to a different level." (Tr. at 118.) At the hearing, the ALJ noted that when the monitor needed to act, those actions were simple and routine, such as making a call or writing down information. (*Id.*) Pushed for a clearer explanation, the VE simply concluded "It's just that we're using a term here called simple and routine. I just–I guess I have a hard time with the–with safety or personnel violations being called routine. That's my view on it." (*Id.*) Thus, the VE could not justify his only rationale for his conclusions. The ALJ was not required to heed this testimony.

Moreover, abundant case law supports the ALJ's interpretation of the position as simple and routine. First, "DOT lists maximum requirements of occupations as generally performed . . . ." SSR 00-4p, 2000 WL 1898704, at *3. The job, as Plaintiff performed it, might have been less demanding. *See, e.g.*, *Jung v. Comm'r of Soc. Sec.*, No. 1:11-cv-34, 2012 WL 346663, at *21 (S.D. Ohio Feb. 2, 2012) (citing cases discussing this aspect of DOT listings).

Second, the ALJ's reading of the DOT listing accords with the predominant interpretation in many circuits. The gravamen of the dispute in the cases, including the present one, is whether

the surveillance position's "reasoning level three" level listed in the DOT is consistent with "simple and routine" work. DOT 379.367-010 *Surveillance Systems Monitor*, *available at* http://www.occupationalinfo.org/37/379367010.html.[12] Individuals at reasoning level three are capable of "[a]pply[ing] commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." DOT, *Appendix C* (4th ed. 1991).

The circuits are split on whether "reasoning level three" positions are consistent with limitations to simple and routine work. Many circuits find no inconsistency. *See Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (finding no conflict between level three reasoning and simple-routine work); *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (noting that level three reasoning is consistent with simple work); *Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 367 (8th Cir. 2007) (same); *Risk v. Colvin*, No. 6:13-cv-00410, 2014 WL 667590, at *2-3 (D. Or. Feb. 20, 2014) (finding no conflict) (adopting report and recommendation); *Alderson v. Colvin*, No. 12-10588, 2014 WL 657827, at *7 (C.D. Cal. Feb. 19, 2014) (noting that "courts in this district" have disagreed that the reasoning level is incompatible with simple and repetitive work); *Mason v. Astrue*, No. 10-2157, 2013 WL 990339, at *4 (D. Md. Mar. 12, 2013) ("[C]ourts have routinely found that a reasoning level of three is consistent with limitations to simple, unskilled tasks.") (report and recommendation); *Williams v. Astrue*, No. 3:11CV592, 2012 WL 4756066, at *3-5 (W.D. N.C. Aug. 27, 2012) (finding no conflict between level three reasoning and "simple, routine, repetitive work") (report and recommendation); *Auguer v. Astrue*, 792 F. Supp.2d 92, 96 (D. Mass.

---

[12] The Department of Labor replaced DOT with the Occupational Information Network. *Cunningham v. Astrue*, 360 F. App'x 606, 616 (6th Cir. 2010). The surveillance monitor position appears in both.

2011) ("The majority of federal district courts . . . have follwed the Seventh and Eighth Circuits" in holding no conflict exists.); *Green v. Astrue*, No. 10-468, 2010 WL 4929082, at *5 (W.D. Pa. Nov. 30, 2010) ("[I]t would be inconsistent with the Commissioner's regulations to rely on maximum reasoning levels as defined by the DOT to argue that the mental demands of surveillance system monitor exceed those for simple unskilled work."); *Prescott v. Astrue*, No. 5:08CV101-J, 2009 WL 539900, at *6 (W.D. Ky. Mar. 4, 2009) (noting that the level three position does not appear to require "complex" decision making).

Other courts hold that the level three reasoning requirement precludes simple and routine work. *See, e.g.*, *Hackett v. Barnhart*, 395 F.3d 1168, 1175-76 (10th Cir. 2005) ("This [simple and routine] limitation seems inconsistent with the demands of level-three reasoning."); *Lee v. Colvin*, No. 2013 WL 1878888, at *9-10 (W.D. Ky. May 3, 2013) (finding a conflict between the DOT description and the simple and routine limitation); *Glass v. Astrue*, No. 12-417-OP, 2012 WL 4848735, at *3 (C.D. Cal. Oct. 10, 2012) (noting that the "weight of authority in [the Ninth] Circuit holds that a limitation to simple, *repetitive* or *routine* tasks is incompatible with a reasoning level of 3");[13] *Myers v. Astrue*, No. 4:11cv62, 2012 WL 4050182, at *18 (E.D. Va. July 6, 2012) (same) (report and recommendation); *Patterson v. Astrue*, No. 8:07-1602, 2008 WL 2944616, at *5 (D. S.C. July 31, 2008) (same) (adopting report and recommendation). Nonetheless, one court, citing numerous cases, stated that the "great weight of authority" found no conflict between reasoning level three and simple work. *Auger*, 792 F. Supp.2d at 97.[14]

---

[13] *See also Garcia v. Astrue*, No. 12-0325, 2013 WL 549079, *3 (C.D. Cal. Feb. 11, 2013) (noting the circuit split and determining that *simple, repetitive, and routine* work was inconsistent with level three reasoning).

[14] Another court has suggested that finding a conflict between reasoning level three and simple work would violate the regulations or rulings. *Green*, 2010 WL 4929082, at *5. The Commissioner has stated that unskilled work under 20 C.F.R. § 404.1568(a) correlates with the DOT specific vocation preparation (SVP) time of one or

Most importantly, the Sixth Circuit has held that "neither the Commissioner nor the VE has an obligation to employ the DOT, and there is no precedent that requires the Commissioner to align DOT 'reasoning levels' with RFC classifications . . . ." *Monateri v. Comm'r of Soc. Sec.*, 436 F. App'x 434, 446 (6th Cir. 2011). The court thus upheld the ALJ's simple and routine limitation even though the VE was not asked to limit his answers to jobs at reasoning level of one. *Id.* In other words, the court rejected "the proposition that jobs requiring reasoning levels two or three are inconsistent as a matter of law with a limitation to simple work." *Id.* (quotation marks omitted). *See also Rienzi v. Colvin*, No. 4:12CV1424, 2013 WL 5279350, at * (N.D. Ohio Sept. 18, 2013) (citing *Monateri* as authority to reject claimant's argument that reasoning levels two and three were inconsistent with a "simple, routine, and repetitive" limitation); *Kozlowski v. Comm'r of Soc. Sec.*, No. 11-cv-12213, 2012 WL 3472354, at *10-13 (E.D. Mich. Mar. 14, 2012) ("[T]he Court finds no conflict between the VE's testimony [based on a simple, routine work limitation] and the DOT's General Educational Developmental Reasoning Level of two.") (report and recommendation), *adopted by* 2012 WL 3493036 (E.D. Mich. Aug. 14, 2012) Thus, the ALJ here properly questioned the VE regarding the possible conflict, researched the DOT, and came to the same conclusion as an apparent majority of courts. Substantial evidence supports her decision.

---

two. SSR 00-4p, 2000 WL 1898704, at *3. The surveillance systems monitor position has an SVP of two. DOT 379.367-010 *Surveillance Systems Monitor*, *supra*. Therefore, under this reasoning, the monitor position is defined by the Commissioner as simple work. *Green*, 2010 WL 4929082, at *5. *See also Corbett v. Barnhart*, No. 1:04cv241, 2006 WL 5527015, at *62 (N.D. W. Va. Mar. 24, 2006) "[T]he job of surveillance system monitor, with an SVP of 2, is consistent with the ALJ's hypothetical requiring the work to be 'unskilled.'"). *But see McHerrin v. Astrue*, No. 09-2035, 2010 WL 3516433, at *6 (E.D. Pa. Aug. 31, 2010) ("The fact that the surveillance monitor's SVP classifies it as 'unskilled," and therefore within Plaintiff's SVP, does not neutralize or supplant the reasoning level conflict."); *Blakley v. Astrue*, No. C08-5186BHS, 2009 WL 279029, at *6 (W.D. Wash. Feb. 3, 2009) ("Other courts decided that . . . the SVP level in a DOT listing indicating unskilled work, does not address whether a job entails only simple, repetitive tasks.") (adopting report and recommendation).

Plaintiff's other objections also fail to persuade. She accuses the ALJ of another botched interpretation of the VE's testimony because the ALJ did not grapple with the psychological distinction the VE made between the monitor position and simple work: the VE "did not state that the 'skill level' of the job increased with activity; instead he stated that activity 'emotionally takes it to another level' . . . . Clearly, these are different things. (Doc. 10 at 15.) Yet, Plaintiff worked at the job for eight months and though she mentioned depression, she does not appear to contend anywhere that she is mentally or emotionally incapable of performing the monitor position. (Tr. 60-64, 232.) See Terry, 580 F.3d at 478 ("Tellingly, Terry does not argue that she cannot perform these skills, perhaps because the record suggests she can . . . ."). In her application paperwork, the only mental issue she noted was difficulty completing tasks. (Tr. at 204.) She followed written and oral instructions "well," got along with authority figures "very well," handled stress "fairly well," and did her "best to deal with change." (Tr. at 204-05.) There was no evidentiary support that Plaintiff could not meet the position's emotional requirements.

Finally, Plaintiff faults the ALJ for not considering that the surveillance position was an accommodated position. (Id.) The ALJ acknowledged taking this into consideration both at the hearing, (Tr. at 109), and in her decision, (Tr. at 26). In any case, the regulations merely allow the ALJ to consider how specialized work conditions and arrangements reflect the claimant's ability to do substantial gainful activity; and they specifically note that "work done under special conditions may show that [the claimant has] the necessary skills and ability to work at the substantial gainful activity level." 20 C.F.R. § 404.1573(c).

The Sixth Circuit in Boyes v. Secretary of Health and Human Services, the lone case Plaintiff cites, found that past work was not substantial gainful employment because the claimant's

productivity was "less than one-half that of a typical nonimpaired person," the claimant needed special transportation arrangements, and "he completed his work duties through constant on-site supervision." 46 F.3d 510, 512 (6th Cir. 1994). The Sixth Circuit has elsewhere described the relevant analysis: "to determine whether a claimant may engage in substantial gainful activity, a court should look to whether the claimant is able to do 'ordinary or simple tasks satisfactorily without more supervision or assistance than is usually given other people doing similar work,' not to whether such work is or is not in a sheltered workshop environment." *Tolliver v. Apfel*, 238 F.3d 424, 2000 WL 1721040, at *3-4 (6th Cir. 2000) (unpublished table decision) (quoting *Boyes*, 46 F.3d at 512). Plaintiff has not provided evidence that any of these circumstances existed in her surveillance position. Instead, she relies on the bare assertion that no other Meijer employee had ever performed such work. (Doc. 10. at 16.) This does not show that the job was under such special conditions that precluded substantial gainful activity.

### 3.   Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is not supported by substantial evidence and should therefore be remanded to gather expert guidance concerning whether Plaintiff's impairments equaled a Listing impairment.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also*

58

28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 30, 2014                              /S Patricia T. Morris
                                                   Patricia T. Morris
                                                   United States Magistrate Judge